Brian K. Jackson (15296)
Brian K. Jackson, LLC
503 W. 2600 S. Suite 200
Bountiful, Utah 84010
Phone: (801) 441-8922
brianj@bjacksonlaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| Katia Montijo<br>    Plaintiff,<br>v.<br>Intermountain Healthcare, Inc.<br>    Defendant. | **COMPLAINT**<br><br>***JURY TRIAL REQUESTED***<br><br>Civil No.: 2:21-cv-00472-TC |

Plaintiff, Katia Montijo, through counsel, files this complaint with the Utah District Court and seeks remedies for legal claims against Defendant, Intermountain Healthcare, Inc. described below:

**PARTIES, JURISDICTION AND VENUE**

1.      Ms. Montijo is a former employee of Defendant, Intermountain Healthcare, Inc. and was a resident of Salt Lake County during her employment.

2.      Intermountain Healthcare Inc., (IHC) is a healthcare corporation which employed Ms. Montijo for employment services in Salt Lake County, Utah whose Utah registered address is located in Salt Lake City, Utah.

3.      Subject matter jurisdiction is proper as this complaint involves claims arising under federal law of Title VII of the Civil Rights Act.

4.      Personal jurisdiction and venue is proper as this involves an employment contract entered into between Defendant and Ms. Montijo, a resident of the state of Utah. The services under the

contract Ms. Montijo provided were done within the state of Utah in Salt Lake County. Intermountain Healthcare Inc. also personally availed itself to the laws of the State of Utah with employing Utah residents for employment services and benefitted from the protections and regulations surrounding employment law and doing business in the State of Utah and would have expected to be sued in this jurisdiction from its employment contracts. Ms. Montijo was also given a notice of right to sue notice for her Title VII claim and filed this complaint within the 90 period the notice of right to sue was issued.

## LEGAL ALLEGATIONS

I. **Violation of Title VII of the Civil Rights Act of 1964**

5. Ms. Montijo has been in the medical field since 1993. Ms. Montijo started a position in March of 2019 with Intermountain Healthcare (IHC) as a medical assistant. The position was specifically seeking a Spanish speaker.

6. Ms. Montijo was born in Peru. Her mother is from Peru and her father is from Colombia. Ms. Montijo has lived in the United States for 34 years and speaks Spanish.

7. On or about March 12th, 2021, Ms. Montijo was accused of calling another IHC co-worker who is Native American, "Pocahontas." Ms. Montijo was placed on suspension without pay.

8. Ms. Montijo has a sister who also worked at IHC and has always had the nickname "Pocahontas" for years. The only time Ms. Montijo recalls calling her sister, who also worked for IHC, Pocahontas at work at the end of a shift around June of 2020. Another employee, Laura Cardozo was present. Ms. Montijo has called her sister this nickname for many years.

9. Ms. Montijo told Human Resources it was a false statement and Human Resources claimed told Ms. Montijo during the investigation that she was not being honest. Human

Resources also did not give Ms. Montijo any details as part of the investigation as to when, where and who claimed to make the accusation for Ms. Montijo to properly respond to and defend or indicate if she was working, present or talked to that individual that day. Ms. Montijo was told that she was terminated from her position on March 18th, 2021 prior to telling her ability to dispute the termination decision under IHC's appeal policy.

10.     A few days prior to the allegations, Ms. Montijo worked a shift that was until 7:30 PM and clocked out at 7:35. Ms. Montijo asked the doctor if he still needed help and he said he was OK. Ms. Montijo was later approached by supervisors and asked what happened as the doctor was asking for help and another co-worker, Laura Cardozo had to stay past 8:20 PM. Ms. Montijo explained that her shift had ended.

11.     After the incident, Ms. Montijo had a conversation with the mother of Ms. Cardozo and asked Ms. Monitjo what was wrong with her and she looked sad. Ms. Montijo said that her daughter made her sad due to what was going on at work and the complaints Ms. Cardozo made against Ms. Montijo. Her mother said that she had heard something about that and that everything was going to be ok and gave Ms. Montijo a hug.

12.     Thereafter, Ms. Cardozo sent a text message to Ms. Montijo indicating that she heard Ms. Montijo tried to approach Ms. Cardozo's mother to talk about Ms. Cardozo. Ms. Cardozo in the text indicated, this was Ms. Montijo's first and last warning and that Ms. Montijo was not to contact Ms. Cardozo, or anyone else in her family or she would "press charges for harassment."

    a.  **Incidents prior to March of 2021.**

13.     Additionally, when Ms. Montijo was first hired in 2019, false allegations were made against her regarding her work performance. There were claims where Ms. Montijo put something down differently than what the patient said about his or her depression.

14. Her supervisor, Ms. Christensen, raised her voice at Ms. Montijo as Ms. Montijo tried to explain the situation and demean Ms. Montijo to where Ms. Montijo felt threatened and belittled and had never been treated like that in her professional career. The situation became so severe Ms. Montijo had to admit herself into urgent care for depression and anxiety and suffered physical symptoms as well.

15. An employee that had been hired around that same time who was caucasion did not receive the same treatment as Ms. Montijo.

16. Ms. Montijo filed a harassment complaint based on race with Human Resources. An HR meeting was called with her supervisor and nothing was done to fix the situation and how to address the situation in the future. After the HR meeting, Ms. Motijo started to be highly micro-managed by her supervisor at work. At one point, her supervisor told her to just sit in a chair and watch the rest of the day. She also had someone look over her shoulder the entire time while she took messages from individuals.

17. The situation at that time was so severe, that Ms. Montijo felt like she had no choice but to leave that specific position at that IHC location.

18. Later, Ms. Montijo found a new position at IHC. In September of 2020, Ms. Montijo ran into the supervisor, Julie Christiensen that was involved in her HR complaint claims in March of 2019 and Ms. Montijo said hello to that supervisor and the supervisor was there for 20 minutes. Ms. Montijo worked with curbside Covid-19 swabbing at that time. Ms. Montijo had no performance issues while she worked there.

19. Three days later, Ms. Montijo was told she was not allowed to go over to the Cottonwood location with the claim Ms. Montijo wasn't doing her job and was disappearing.

20. Ms. Montijo had the supervisor from that area contacted, Crystal who indicated nobody

had complained about Ms. Montijo.

21. Ms. Montijo maintains she was subject to a severe and pervasive hostile work environment based on her race with her former supervisor Ms. Christensen and the false claims made against Ms. Montijo. Ms. Montijo maintains that the only basis for the harassment could be based on Ms. Montijo's race. Other individuals in the same situation with the same experience that were caucasion did not receive the same treatment Ms. Montijo did. The position was specifically seeking a Spanish speaker and it was clear Ms. Christensen was not fond of Ms. Montijo and her race despite the need for a Spanish speaker. Ms. Montijo had never been treated in such a way throughout her medical career or had so many complaints filed against her than she did when she worked with Ms. Christensen.

22. Ms. Montijo was also subject to severe and pervasive harassment with the false complaints Ms. Cardozo made against Ms. Montijo based and her race and ethnicity including the false complaint Ms. Montijo made discriminatory comments toward another individual based on her race. Ms. Montijo was also subject to severe and pervasive harassment with how Human Resources treated the complaint and the lack of impartiality during the investigation. Ms. Montijo was accused of not being honest during the investigation. Ms. Montijo was also further harassed by IHC when it failed to allow Ms. Montijo to appeal the decision as allowed under company policy prior to ultimately terminating her.

23. Ms. Montijo also maintains the adverse action as to her employment in September of 2020 was based on her race and the complaint she made against her supervisor in March of 2019 for harassment and discrimination based on Ms. Montijo's race.

24. Ms. Montijo also maintains she was unlawfully terminated based on her race with the false complaint made against her by another employee that she called another employee that was

Native American Pocahontas. Ms. Montijo, based on information and belief, maintains it was made by Laura Cardozo. Ms. Montijo only made mention of that nickname in front of Ms. Cardozo in June of 2020.

25. Ms. Montijo also maintains that the false statement was harassment toward Ms. Montijo based on false allegations of racial discrimination when Ms. Cardozo falsely claimed Ms. Montijo left her work early on or about March 12th, 2021 to put the blame on Ms. Montijo for not being there when the doctor needed assistance after Ms. Montijo left.

26. Ms. Montijo also maintains that HR accused Ms. Montijo and did not believe her story based on her race and the ultimate decision to terminate her was because of her race.

27. Ms. Montijo also maintains that part of the basis for terminating Ms. Montijo was due to her employment record and the retaliatory complaint against Ms. Montijo in September of 2020 from her supervisor. The complaint of which was based on Ms. Montijo's race.

28. Ms. Montijo also maintains that Human Resources retaliated against Ms. Montijo for opposing a false claim of discrimination against her based on the treatment she recieved from Human Resources when she reported that the statement was false and accusing her for not being honest, terminating her, and not allowing her to appeal the termination decision before it was final.

29. Ms. Montijo suffered from emotional distress due to the harassment from the false complaint and false claims made against Ms. Montijo. She had also suffered from lost wages and benefits and her ability to find future employment due to the wrongful termination. At the time of separation, Ms. Montijo was making $19.75 an hour and her lost wages and benefits past and future are $354.480.00. Ms. Montijo also seeks reimbursement of consequential damages that resulted as a result of her termination of employment, including lost savings, borrowed money

from friends and family members and other lost assets. Ms. Montijo also seeks punitive damages for the wilful and wanton and reckless actions from her former supervisor, the individual that made the false statement and from how Human Resources treated the claim. Ms. Montijo also seeks reimbursement of attorney fees and costs authorized under statute.

**II. Defamation of Character**

30. Ms. Montijo incorporates the facts in the paragraphs 5 - 24 of this complaint here.

31. Ms. Montijo maintains the false statement that Ms. Montijo calling another Native Employee "Pocahontas" was defamatory. The false statement was in relation to Ms. Montijo's business profession and her work performance and treatment of her business peers. The false statement also lowered Ms. Montijo's reputation as it inferred Ms. Montijo discriminated against other employees.

32. The statement was false. Ms. Montijo never made that statement to other IHC employees as claimed except to her sister and whom she has called her that name for years and did not have a discriminatory intent.

33. The false statement was also made by another IHC employee acting within his or her course and scope of employment with the intent to benefit IHC with a claim of harassment to Human Resources. IHC also took on the statement as if it was its own and maintained that Ms. Montijo had made such a false statement.

34. The false statement was also made with malice given the falsity of the statement, or in reckless disregard as Ms. Montijo only used that term toward her sister and not toward another Native American employee.

35. Also, upon information and belief, Ms. Montijo maintains that the statement was made by Laura Cardozo, in response to the treatment she received from IHC after IHC learned that the

earlier statement she made regarding Ms. Montijo and leaving work early was false. This is based on the timing of the statement that was made immediately after IHC learned the prior accusation against Ms. Montijo was false. This is also based on the fact that Ms. Cardozo was only the other person present when Ms. Montijo used that term in June of 2020 in a conversation that included her sister. This also further indicates that the statement was made with malice and reckless disregard for the truth as an attempt to have Ms. Montijo terminated.

36. The false statement effectively terminated Ms. Montijo from her position and made her suffer from lost wages and benefits and her ability to find a future position in the amount of at least $354.480.00. The false statement also caused Ms. Montijo to suffer from emotional distress due to dealing with the allegations of the false statement and the loss of her position. The false statement also lowered Ms. Montijo's reputation in the community and among her peers at work. Those damages of which amount to at least $1,063,440.00

37. Ms. Montijo also seeks punitive damages for the false statement that was made in malice or in reckless disregard to the truth.

38. Ms. Montijo also seeks reimbursement of consequential damages that resulted as a result of her termination of employment, including lost savings, borrowed money from friends and family members and other lost assets.

**III. Breach of Contract**

39. Intermountain Healthcare has an "Employee Complaint Resolution Policy" which applies uniformly to all employees.

40. The policy allows IHC employees to file a complaint and have his or her issues or concerns listened to and reviewed by the manager or officer in his or her chain of command.

41. If a party involved is unable to find a satisfactory solution to a stated problem any of the

parties may request that the problem be taken to the next level for review. If a party is not satisfied with the decision of the next level review, it may be reviewed by the Chief Operating Officer.

42. These terms were terms that Ms. Montijo could reasonably rely on as part of her employment and employment contract with IHC.

43. Instead of allowing Ms. Montijo to appeal the decision of her termination, under the provisions of the "Employee Complaint Resolution Policy." IHC determined to terminate the employment relationship prior to affording Ms. Montijo the appeal rights under the policy. The failure to do so is a breach of the terms and conditions of Ms. Montijo's employment contract. Ms. Montijo could reasonably expect for her employment not to be terminated until she was afforded the appeal process.

44. Ms. Montijo suffered from her lost IHC wages and benefits past and future due to the breach of the terms and conditions of her employment contract minus any mitigated damages on her good-faith effort to find additional employment. Ms. Montijo also seeks reimbursement of consequential damages that resulted as a result of her termination of employment, including lost savings, borrowed money from friends and family members and other lost assets.

**IV. Breach of Good-Faith and Fair Dealing.**

45. Ms. Montijo incorporates the facts described in the breach of contract claim here. Ms. Montijo maintains that IHC intentionally destroyed the fruits and benefits of her employment contract with IHC and her right to internally appeal prior to terminating her. The actions were done intentionally with the false complaint made described in the defamation section of this complaint.

46. IHC also knew or should have known and recklessly denied and interfered with Ms.

Montijo's right to appeal pursuant to its "Employee Complaint Resolution Policy" when it terminated Ms. Montijo and severed the employment relationship prior to affording her her appeal rights under the policy.

47. The false complaint and the failure to afford Ms. Montijo her appeal rights prior to terminating her breached the implied covenant of good-faith and fair dealing based on the steps and procedures necessary to follow prior to terminating Ms. Montijo.

48. Ms. Montijo also seeks damages described under the breach of contract claim. Ms. Montijo also suffered from emotional distress as well from the false complaint and her inability to appeal the decision prior which resulted in the loss of her position. Ms. Montijo also seeks punitive damages to punish IHC for its intentional wilful and wanton disregard to Ms. Montijo and her appeal rights and her employment contract.

## PRAYER FOR RELIEF

49. WHEREFORE, Ms. Montijo respectfully makes the following request for relief from this court:

50. For a factual finding of fault identified in each cause of action above.

51. For damages as identified in each cause of action.

52. For a jury trial to determine the factual issues of this case.

53. For a cease and desist notice to be issued to IHC to cease and desist all discriminatory conduct.

54. For a finding of monetary damages which Ms. Montijo pleads in this complaint.

55. For punitive damages at the maximum amount authorized by law.

56. For pre and post interest from judgment on this case.

57. For any other damages and remedies the court may deem necessary or fit.

Respectfully submitted this 3rd day of August 2021,

_____

Brian K. Jackson
Brian K. Jackson, LLC
Attorney for Katia Montijo